IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT E. FALCONE, M.D., F.A.C.S.,** | : | |
| Plaintiff, | : | |
| | : | Case No. 2:08-CV-300 |
| v. | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY** | : | Magistrate Judge King |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on the Cross Motions for Partial Summary Judgment of Robert E. Falcone, M.D., F.A.C.S. ("Dr. Falcone") and Provident Life & Accident Insurance Company ("Provident"). Both parties move for summary judgment on the issue of applicability of the Employee Retirement Income Security Act to Dr. Falcone's claims. For the reasons listed below, Dr. Falcone's Motion for Partial Summary Judgment is **DENIED**, and Provident's Motion for Partial Summary Judgment is **GRANTED**.

### II. BACKGROUND

Dr. Falcone was employed by Central Ohio Surgical Clinic Inc. ("Central Ohio") from 1981 to 1994. Upon his hire, Central Ohio offered Dr. Falcone various benefits, including disability insurance. As a general practice, Central Ohio purchased these benefits for its employees as a group in order to save money on rates. Dr. Falcone chose to apply for Central Ohio's disability insurance coverage, which it offered through Provident. Pursuant to Central Ohio's group arrangement, Provident issued to Dr. Falcone a policy identified as Accident and Sickness Policy No. 34151/06/479603 (the "Policy").

Though the Policy was an individual policy covering only Dr. Falcone, Provident issued the Policy pursuant to a long-standing group arrangement between Central Ohio and Provident, evidenced by a Salary Allotment Agreement. A Salary Allotment Agreement is the vehicle by which Provident offered group discounts to employers seeking to sponsor a disability insurance plan. Under this negotiated agreement, Provident would issue individual disability insurance policies to certain employees whom the employer chose to include in its plan. Usually, the employer also chose the policy terms that were included. The employer assumed responsibility for paying premiums for the policies under a common billing invoice, and in exchange, the employer received a multi-life discount. Provident would maintain these policies under a single risk group number related solely to that employer.

Central Ohio had existed for many years prior to Dr. Falcone's hire in 1981. In 1973, the Corporation entered into a Salary Allotment Agreement with Provident. On the information sheet that Central Ohio submitted with its Salary Allotment Agreement, Central Ohio stated that it would pay all of the cost of the premiums, and it chose three physicians from its current group of seven employees as those who would be eligible for the plan. In the Salary Allotment Agreement itself, Central Ohio agreed "to pay in full the required premiums for such policies and to remit such premiums to the Insurance Company when due."

Thereafter, Provident provided individually numbered policies to certain eligible employees of Central Ohio who chose to apply for disability insurance, and those policies were together classified as an employer-sponsored group, Risk Group No. 05955. Premiums for the risk group policies were billed, in full and as a group, to Central Ohio, and Central Ohio remitted one aggregate check to Provident. Because of the policies' inclusion in the Risk Group,

Provident granted a ten percent, multi-life discount on the premiums.

Dr. Falcone's Policy was issued pursuant to this arrangement upon his joining of Central Ohio in 1981. Dr. Falcone did not negotiate the terms of his Policy and did not pay any of the premiums on his Policy. As with the policies of other employees in the Risk Group, Dr. Falcone's Policy contained a Salary Allotment Rider that specifically acknowledged that the Policy was issued pursuant to the Salary Allotment Agreement.

Throughout Dr. Falcone's employment, in compliance with the Salary Allotment Agreement, Central Ohio regularly issued checks to Provident for Dr. Falcone's premium. Clerical employees or a more senior physician at Central Ohio handled the details and administration of Dr. Falcone's Policy, including writing all premium checks, handling accounting, and maintaining a relationship with an insurance broker who oversaw the policies. Dr. Falcone did not handle any aspect of the payment of his Policy premiums or the administration of the Policy during his employment, nor did he have any involvement in Central Ohio's relationship with Provident.

The Salary Allotment Rider, which was a part of Dr. Falcone's Policy, stated:

The insurance under the policy shall not continue in force beyond the time for which the premium is paid, subject to the grace period set forth in the policy.[1]
If the Insured's employment with the Employer is terminated, if the Salary Allotment Agreement is terminated, or if for any reason premiums are not paid to the Company by the Employer, this rider shall be void.

Dr. Falcone left his employment at Central Ohio in December of 1993 to join Ohio Health. Central Ohio ceased paying Dr. Falcone's premium on his Policy on January 1, 1994,

---

[1] The grace period was 31 days after the date the premium was due.

and he was subsequently removed from the Central Ohio Risk Group.[2]

On March 3, 1994, Provident offered Dr. Falcone the opportunity to pay for individual disability coverage that would provide the same multi-life discounted premium he received as a participant in the Central Ohio employee benefit plan. The offer letter explained:

> Important news from Provident Life and Accident Insurance Company regarding your disability coverage! Now, even though your policy is no longer paid through Risk #5955, CENTRAL OHIO SURGICAL CLINIC INC., you can continue this policy and retain the multi-life discount. . . . You don't even have to provide proof of good health . . . Just to make sure you are not without this vital coverage, we've waived the premium for January. . . . We are happy to offer you the opportunity to continue this important individual coverage at discounted rates.

The letter identified the same policy number that had always applied to Dr. Falcone's Policy, and it explained that he would be covered for the same amount of monthly benefits. The letter made no representation as to a new policy, new effective date, or any changes to the terms or conditions of the Policy. Dr. Falcone was not required to undergo underwriting or to provide evidence of good health to continue his coverage.

Dr. Falcone followed Provident's instructions and signed the offer letter under the statement, "YES; I want to continue this coverage," and he returned the letter to Provident along with a premium payment. The disability coverage went into effect with the same policy number as the Policy he had while employed with Central Ohio, the same terms, and the same discounted premiums. Provident waived Dr. Falcone's premium for the month of January, so he was covered beginning January 1, 1994, even though he was not billed for January. Provident used an effective date of February 1, 1994 to start directly billing Dr. Falcone. Thereafter, Dr. Falcone

---

[2]Though Dr. Falcone is no longer part of the Central Ohio Risk Group, that group remains in existence today, sponsored by successors to Central Ohio.

remitted premium checks to Provident.

Dr. Falcone has personally paid the premiums for the Policy since March of 1994. On January 28, 2006, Dr. Falcone was injured. He made a claim for disability coverage under the Policy. Provident refused to provide the coverage to which Dr. Falcone claims he is entitled. Based on this coverage dispute, Dr. Falcone has asserted claims for breach of contract and for bad-faith denial of insurance coverage.

### B. PROCEDURAL HISTORY

On March 4, 2008, Dr. Falcone filed a complaint against Provident in the Franklin County Court of Common Pleas. Provident removed that case to this Court on the basis of federal question jurisdiction under the Employee Retirement Income Security Act ("ERISA") and diversity jurisdiction. On May 21, 2008, this Court issued its Preliminary Pre-trial Order, stating:

> A threshold issue is the extent to which, if at all, ERISA applies to this case. If it does, there will be no merits discovery and the issues will be resolved on the administrative record. If ERISA does not apply, the parties will engage in general merits discovery and the issues will be resolved by this Court de novo.

(Doc. No. 11.) The parties have both submitted motions for partial summary judgment on the issue of the applicability of ERISA.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light

most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation.

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts . . . Rather, the court must evaluate each party's motion on its own merits . . .

*Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

### IV. LAW AND ANALYSIS

### A. ERISA PREEMPTION

ERISA governs any "employee benefit plan" if the plan is established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a)(1). As applicable to this case, an "employee welfare benefit plan" is defined as: "any plan . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance . . . benefits in the event of

disability . . ." 29 U.S. C. § 1002(1).

Anyone who qualifies as a "participant or beneficiary" of an employee benefit plan may sue to enforce rights conferred upon them by ERISA. 29 U.S.C. § 1132(a). This provision impliedly preempts state claims that could have been brought under ERISA's provisions. *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 943 (6th Cir. 1994). Congress did not intend, however, for ERISA "to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries." *Penny/Ohlmann/ Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005).

In the case sub judice, Central Ohio purchased several individual disability policies for its employees, including Dr. Falcone, and paid the disability insurance premiums for those employees as a group. As a threshold matter, the fact that the Policy was issued as an individual policy does not preclude the application of ERISA. The Sixth Circuit has repeatedly confirmed that "an ERISA plan can consist of individual disability insurance policies covering each of the employer's employees, rather than a group policy." *Agrawal v. Paul Revere Life Ins. Co.*, 205 F.3d 297, 301 (6th Cir. 2000) (citing *Mass. Casualty Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997)). Dr. Falcone concedes that the Policy originated as part of an employee benefit plan and that it remained covered by ERISA until his employment with Central Ohio ceased.

The issue before this Court, therefore, is whether at the time of the events giving rise to Dr. Falcone's alleged disability his Policy was still a part of Central Ohio's employee benefit plan or otherwise was an employee benefit plan under ERISA. "Determining the existence of an ERISA plan is a question of fact to be answered in light of all the surrounding circumstances and

facts from the point of view of a reasonable person[.]" *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 847 (6th Cir. 2006) (citing *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 434 (6th Cir. 1996)). If Dr. Falcone's Policy was still part of Central Ohio's employee benefit plan, or otherwise was an employee benefit plan under ERISA, then Dr. Falcone's Policy is governed by ERISA and Dr. Falcone's state law claims are preempted by ERISA. If Dr. Falcone's Policy no longer was part of Central Ohio's employee benefit plan, and otherwise was not an employee benefit plan, then Dr. Falcone's Policy is not governed by ERISA, ERISA does not preempt the application of state law to the Policy, and Dr. Falcone may pursue the state law claims he has asserted.

### B. ERISA PREEMPTION POST-TERMINATION

Dr. Falcone makes several arguments as to why his Policy was no longer part of Central Ohio's employee benefit plan, and otherwise was not an employee benefit plan. First, Dr. Falcone asserts that under the language of the Policy, his coverage ended upon his termination, and there was no option to continue coverage. Second, Dr. Falcone contends that he was not offered his current Policy until two months after termination of his coverage under Central Ohio's employee benefit plan, and, therefore, his premiums and the Policy had lapsed.[3] Third, Dr. Falcone urges that his Policy resembles an individual rather than a group policy, and thus should be treated as an individual policy. Once his Policy was shorn of the Salary Allotment Rider, he contends it was indistinguishable from policies sold to individuals without ever having any employer group involvement.

---

[3]Provident waived Dr. Falcone's premium payment for January and used an effective date of February 1, 1994 to start directly billing Dr. Falcone. Dr. Falcone was thereby continuously covered under his Policy.

## 1. Enrollment in Group Terminated and No Right to Continue

Dr. Falcone argues that per the language of the Policy, his coverage ended upon his termination, and there was no option to continue coverage. Courts that have addressed the issue of whether an employee's policy is covered by ERISA after termination of his employment analyze whether the policy appears to be a continuation policy or conversion policy. *See, e.g., Reynolds*, 113 F.3d at 1453; *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 878 (9th Cir. 2001). Any claim for continuation coverage is preempted by ERISA. *Reynolds*, 113 F.3d at 1453.[4] Conversion coverage, on the other hand, results in a new policy, so ERISA may no longer apply. *See, e.g., Waks,* 263 F.3d at 875-76 (9th Cir. 2001) (finding the converted policy was not preempted by ERISA); *Crawley v. Oxford Health Plans, Inc.*, 309 F.Supp.2d 261, 265 (D. Conn. 2004) (same); *but see Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1344 (11th Cir. 1994) (finding the converted policy was preempted by ERISA because it continued to be integrally linked with the ERISA plan); *Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 349-40 (8th Cir. 1997) (same).[5]

The Policy in the case sub judice is not the result of either statutorily mandated

---

[4] The Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") amended ERISA and requires that sponsors of ERISA group health plans provide plan beneficiaries the option to elect "continuation coverage" that is identical to coverage provided under the plan for a limited period following employment termination under certain condition. *Mimbs v. Commercial Life Ins. Co.*, 818 F.Supp. 1556, 1561 (S.D. Ga. 1993), *cited by Reynolds*, 113 F.3d at 1453. COBRA applies to group health plans, however, and has nothing to do with disability insurance of the sort as in the case sub judice. *Reynolds*, 113 F.3d at 1453 n.1.

[5] A conversion occurs where an employee exercises the right under a conversion provision to convert his or her traditional group coverage into a completely new, separate, individual policy. *Reynolds*, 113 F.3d at 1453; *Waks,* 263 F.3d at 876. Conversion did not occur in the case sub judice because there was no conversion provision in the ERISA plan.

continuation or conversion coverage. Provident argues, however, that the disability coverage Dr. Falcone obtained after the termination of his employment was merely a continuation of the ERISA covered Policy he had while employed at Central Ohio. As such, Provident contends his Policy post-termination should be viewed as similar to COBRA continuation coverage, and thus be covered by ERISA. Dr. Falcone counters that the disability coverage he obtained was a completely new policy. As such, he contends his Policy post-termination should be viewed as similar to conversion coverage, and thus not be covered by ERISA.

The language of the Policy conveyed to the insured: "You have the right to continue this policy in force by the payment of premiums when due at the premium rate expressed herein until the next premium due date after your 65th birthday." The Policy, therefore, granted a continuation right that makes this similar to COBRA continuation coverage. The Salary Allotment Rider for Dr. Falcone, which is part of the Policy, stated:

> If the Insured's employment with the Employer is terminated, if the Salary Allotment Agreement is terminated, or if for any reason premiums are not paid to the Company by the Employer, this rider shall be void.

This provision merely means that once Dr. Falcone's employment with Central Ohio was terminated, the Salary Allotment Rider was no longer included in the Policy. Therefore, Dr. Falcone's Policy was no longer a part of the Central Ohio Risk Group. The termination of his employment, though it voided the Salary Allotment Rider, did not, however, terminate the Policy itself.

Following the termination of Dr. Falcone's employment, he was removed from the Central Ohio Risk Group, effective January 1, 1994. On March 3, 1994, Provident sent Dr. Falcone an offer letter which indicated that even though his Policy was no longer paid through

the Risk Group, he could "continue this policy and retain the multi-life discount" and that he could "continue this important individual coverage at discounted rates." The offer letter never notified Dr. Falcone that his policy had lapsed or that his disability coverage had been terminated. Dr. Falcone signed the offer letter, indicating: "YES; I want to continue this coverage."

Dr. Falcone compares his Policy to the policies in *Waks*, 263 F.3d 872 and in *Demars v. CIGNA Corp.*, 173 F.3d 443 (1st Cir. 1999). He asserts that these decision are "persuasive" because "they apply ERISA preemption in a comparable context." (Pl. Response p. 2.) In both those cases, the employee was injured after the group coverage had ended and had been converted to an individual policy. *Waks*, 263 F.3d at 875; *Demars*, 173 F.3d at 444. In both cases, the court held that state-law claims arising under an individual policy that has been converted from an ERISA plan are not preempted. *Waks*, 263 F.3d at 877; *Demars*, 173 F.3d at 450. *Demars* rejected characterization of conversion policies as ERISA plans "because employers do not bear any administrative or financial responsibility for them." 173 F.3d at 446. The policies in *Waks* and *Demars* are both distinguishable from the policy in this case, however, because they were policies that arose under a conversion right under an ERISA plan. There was no conversion right in Dr. Falcone's Policy.

The Court finds the case sub judice instead to be extremely similar to the Sixth Circuit's *Reynolds* case.[6] In that case, Reynolds's disability policy was part of an employee benefit plan.

---

[6]*Waks* specifically distinguishes itself from *Reynolds*, finding "*Reynolds* did not decide whether a true converted policy is subject to ERISA. Rather, *Reynolds* analogized the plaintiff's policy to continuation coverage, because after he left employment the plaintiff kept the same policy for which the employer had previously paid but paid the premiums himself." 263 F.3d at 878. Though *Reynolds* was decided in 1997, it is still good law as there is no contrary Supreme

-11-

113 F.3d at 1452. The policy included a common employer rider, pursuant to which the company paid the policy premiums, which were subject to a ten percent group discount. *Id.* The policy stated that premiums were to be paid by the company unless and until the employee left the company, at which time the employee, if he wanted his coverage continued, could start paying his own premiums. *Id.* Reynolds's employment was terminated, so the common employer rider was lost because it was conditioned on his employment. *Id.* Reynolds took over paying his own premiums, which increased due to the loss of the ten percent group discount, "but the disability policy was not otherwise affected" by his departure. *Id.* The Court found that his post-employment coverage was not conversion coverage, but rather, bears a "strong resemblance" to "continuation coverage" and, as such, was governed by ERISA. *Id.* at 1253.

Dr. Falcone's enrollment in Central Ohio's Risk Group was terminated due to the voiding of the Salary Allotment Rider; but, as in *Reynolds*, this did not terminate his Policy or mean that his Policy was no longer covered by ERISA. Pursuant to the Policy, he had the right to continue the Policy by paying the premiums himself. The offer letter identified the same policy number that had always applied to Dr. Falcone's Policy, and it explained that he would be covered for the same amount of monthly benefits. The offer letter made no representation as to a new policy, new effective date, or any changes to the terms, conditions, or multi-life discounted premiums of the existing Policy. Dr. Falcone was not required to undergo underwriting or to provide evidence of good health to continue his coverage. The only difference was that Dr. Falcone, rather than Central Ohio, now remitted premium checks to Provident. This case appears even more like

---

Court or Sixth Circuit precedent. It was most recently favorably cited by another district court in the Sixth Circuit in the case of *Bates v. Provident Life and Accident Ins. Co.*, 596 F.Supp.2d 1052, 1059 (E.D. Mich. 2009).

continuation coverage than *Reynolds* because Dr. Falcone even retained the group discount, which the plaintiff in *Reynolds* did not.

In light of *Reynolds*, this Court finds that Dr. Falcone's termination merely voided the Salary Allotment Rider, terminating his enrollment in Central Ohio's Risk Group. This did not, however, void his disability Policy. The Policy granted him a right to continue the Policy by taking over the payment of the premiums himself. Therefore, if he exercised his continuation right pursuant to the Policy, his post-employment coverage would bear a strong resemblance to COBRA continuation coverage, which is governed by ERISA.

### 2. Lapse of Premiums and Coverage

Dr. Falcone contends that even accepting that the Policy granted a continuation right under which he could have taken over payment of the premiums and continued coverage, there was a lapse in premiums, that resulted in a lapse of coverage. Therefore, he asserts, the coverage he obtained post-termination was not similar to COBRA continuation coverage.

Central Ohio paid Dr. Falcone's premiums through January 1, 1994. Thereafter, no premiums were paid on his policy until March of 1994. He was not sent the offer letter for continuation of his coverage, which he asserts was actually a solicitation for his business, until March 3, 1994. Therefore, between January and March, no premiums had been paid. The fact that Dr. Falcone did not immediately take over payment of premiums is a distinguishing fact from *Reynolds*.[7] The question is, however, did the fact that Dr. Falcone did not pay premiums for two months void his continuation right, thus removing his Policy from Central Ohio's employee

---

[7]Dr. Falcone contends, "*Reynolds* does not control at bar because Dr. Falcone and Provident entered into an individual insurance policy after the group policy had lapsed." (Pl. Brief. p. 12.)

benefit plan?

If Dr. Falcone had immediately taken over payments in January, then, as already determined by this Court, he would have been exercising his continuation right and, pursuant to *Reynolds*, his policy would be covered by ERISA. In the offer letter Provident sent to Dr. Falcone, Provident informed Dr. Falcone that it had waived his premium for January. Provident used an effective date of February 1, 1994 to start directly billing Dr. Falcone. Therefore, Dr. Falcone was retroactively continuously covered after the termination of his employment, and he was treated as though his premiums had never lapsed.

Comparing this situation to COBRA continuation coverage, COBRA sets a minimum election period of 60 days to elect continuation coverage after coverage terminates under the plan. 29 U.S.C.A. § 1165(1).[8] If someone elects continuation coverage, then coverage shall commence on the date on which coverage terminated under the plan. 29 U.S.C.A. § 1165(2). In other words, it does not matter under COBRA for continuation coverage purposes that premiums lapsed, as a person is viewed as retroactively covered from the date of termination if they later elect coverage. Because Dr. Falcone's continuation right under the Policy bears a strong resemblance to COBRA continuation coverage, this Court finds that even though his premiums lapsed, because he elected continuation coverage and premiums were then either waived or paid for past unpaid months, he was retroactively covered for the entire period post-termination. It is as though he made the election in January of 1994, and thus his coverage never terminated.

---

[8]This is just a statutory minimum, and the plan may provide for an election period greater than 60 days. *Branch v. G. Bernd Co.*, 955 F.2d 1574, 1577 (11th Cir. 1992).

### 3. Resembles an Individual Policy

Dr. Falcone contends that his policy resembles an individual rather than a group policy, and thus should be treated as an individual policy. He asserts that a reasonable person would not believe the Policy was governed by ERISA. *See Kolkowski*, 448 F.3d at 847 ("Determining the existence of an ERISA plan is a question of fact to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person[.]"). Once his Policy was shorn of the rider, he contends it was indistinguishable from policies sold to individuals without ever having any employer group involvement. Dr. Falcone also emphasizes that the policy is a contract between only Provident and Dr. Falcone, and Central Ohio does not keep records concerning Dr. Falcone's Policy, does not administer premium payments, and has no involvement with the Policy.

The reasonable person test does not mean a specific employee has to know a plan is governed by ERISA; rather, it means if a reasonable person in possession of the facts would be able to discern that a plan existed, then that plan is possibly an ERISA plan. *Nicholas v. Standard Ins. Co.*, No. 00-1728, 2002 WL 31269690, at *6 (6th Cir. Oct. 9, 2002). The Policy granted a right for Dr. Falcone to continue coverage by taking over payment of the premiums. Provident's offer letter offered Dr. Falcone "continuation" coverage. It identified the same policy number that had always applied to Dr. Falcone' Policy, the same monthly benefit, and the same discounted premiums. It did not reference a new policy, effective date, or terms or conditions. Provident did not require underwriting or evidence of good health. A reasonable person would be able to discern that by exercising a right to continue a policy that was part of an employee benefit plan, the policy remained a part of the plan.

*Reynolds* found that ERISA governs when coverage bears a "strong resemblance" to COBRA continuation coverage. 113 F.3d at 1153. This is true despite the fact that the former employee takes over payment of premiums himself and the employer no longer has any involvement with the policy. *Id.* at 1252. Other courts faced with similar situations have consistently found that ERISA continues to apply after an employee's termination when the employee continues coverage and takes over payment of premiums. *See, e.g., Vincent v. Unum Provident Corp.*, No. 1:04-CV-340, 2005 WL 1074370, at *4 (E.D. Tenn. May 5, 2005) (finding that when a plaintiff leaves his employment with a company and takes over payment of the full amount of premiums of a disability policy himself, but continues identical coverage under identical terms as initially acquired by virtue of the previous employment relationship, ERISA still applies to the policy); *Alsup v. Unum Provident Corp.*, No. 06-0558, 2009 WL 62660, at *7 (W.D. La. Jan. 9, 2009) (finding that if a plan is originally established as subject to ERISA, the policy issued under the plan remains subject to ERISA even though the individual employee takes over payment of the premiums); *Tannenbaum v. Unum Life Ins. Co. of Am.*, No. 03-CV-1410, 2006 WL 2671405, at *8 (E.D. Pa. Sept. 15, 2006) (finding ERISA applied when plaintiff left his employment with a company and took over payment of his disability policy himself without the discount on premiums).

Therefore, even though Dr. Falcone's Policy post-termination may have resembled an individual policy because he was no longer a part of the Central Ohio Risk Group, Central Ohio had no involvement in the administration of the Policy, and he paid the premiums on the Policy, this Court finds that Dr. Falcone's Policy was part of an ERISA controlled employee benefit plan because: (1) the Policy originated with an employee benefit plan; (2) the Policy had language

providing the right to continue the Policy by the payment of premiums by the employee; (3) post-employment, the Policy had the same policy number as during employment; (4) post-employment, Dr. Falcone continued to benefit from the premium discount, and the premiums due under the Policy did not change; (5) post-employment, the terms of the Policy remained unchanged; and (6) post-employment, Central Ohio's employee benefit plan continued to operate.[9]

## C. STATE LAW CLAIMS

Dr. Falcone has brought state law claims for bad faith and breach of contract against Provident. State law claims that could have been brought under ERISA's provisions are preempted. *Alexander*, 13 F.3d at 943. Both claims involve Provident's alleged failure to provide benefits under a Policy that is part of an ERISA governed employee benefit plan. Both claims, therefore, could have been brought under ERISA, and are thus preempted.

## V. CONCLUSION

For the foregoing reasons, Dr. Falcone's Motion for Partial Summary Judgment is **DENIED**, and Provident's Motion for Partial Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: September 9, 2009**

---

[9]Though Dr. Falcone is no longer part of the Central Ohio Risk Group, that group remains in existence today, sponsored by successors to Central Ohio.